**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| LAVINIA JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-1178-CDW |
| | ) | |
| JUDITH E. BARNES, | ) | |
| | ) | |
| Respondent. | ) | |

**POST-TRIAL REPORT**

Date Submitted: February 13, 2025
Date Decided: May 14, 2025

Angelica M. Mamani, HUDSON, JONES, JAYWORK & FISHER, Dover, Delaware; *Counsel for Petitioner*

Peter K. Schaeffer, Jr., AVENUE LAW, Dover, Delaware; *Counsel for Respondent*

**WRIGHT, M.**

Over the course of a multi-year housing relationship, three attempts were made to structure a real estate transaction so that the petitioner in this action could purchase the house in which she has resided for nearly 11 years from respondent and respondent's late husband. The third attempt was a purported installment sales contract with seller financing, which contemplated petitioner making five years' worth of monthly payments and a large balloon payment at the end of those five years. Petitioner did not tender the balloon payment at the appointed time. She did not have then, nor does she have today, the financial ability to complete the purchase.

But petitioner says her past and present inability to close on the purchase of the home do not matter. She says that under Delaware law she was supposed to receive written notice of default from respondent when she failed to make the balloon payment, which she says she did not receive, and that Delaware law gives her 120 days to cure the default after receiving this written notice. So petitioner says she still has time on the clock and asks the court to give her a chance to obtain the financing she needs to complete the sale.

The court cannot. The statute that petitioner relies on, Section 314 of Title 25 of the Delaware Code, does not work the way petitioner claims—its protections are only available if parties to residential real estate contracts with seller financing include those protections in their written contract, and that did not happen here. So even if the parties had a valid and enforceable written

contract to sell the house—and they did not—the court cannot grant petitioner the relief she seeks. Specific performance is not available, and neither is petitioner's additional requested relief of an accounting nor her alternative requested relief of damages.

## I. FACTUAL BACKGROUND

These are the facts as the court finds them after trial.

### A. The Parties

Petitioner Lavinia Johnson ("Ms. Johnson") resides at 282 Beachwood Avenue in Dover ("Property").[1] When Ms. Johnson first moved to the Property, it was owned by Maurice Barnes ("Mr. Barnes") and respondent Judith Barnes ("Ms. Barnes") (jointly, "Barneses") as tenants by the entirety.[2] Mr. Barnes passed away in June 2021.[3] Upon Mr. Barnes' death, Ms. Barnes became the sole owner of the Property in fee simple.[4] The Barnes' son, Gerald

---

[1] D.I. 39 ("Tr.") 9.

[2] *See* Petition ("Pet."), Docket Item ("D.I.") 1, Ex. D.

[3] Tr. 56 ("Q. And did you – June of 2021, to say that sound right? A. That's about right, I guess, yeah.").

[4] *See Conaway v. Hawkins*, 2011 WL 3444567, at *1 (Del. Ch. July 29, 2011) (explaining that if two parties "were in fact legally married," then the death of one would vest in the other "full title" to a property).

("Gerry Barnes"), holds a durable power of attorney for Ms. Barnes,[5] who was unable to attend trial (or testify) for health-related reasons.[6]

Ms. Johnson has resided at the Property for almost eleven years. She moved there in July 2014, three months after Ms. Johnson "met Maurice Barnes at 282 Beechwood at a yard sale, and he informed [her] that the house was available for sale."[7] Ms. Johnson was interested, but she "wasn't sure where [she] was going to get the funds or if [she] would have enough funds to continue to pay for the house."[8] To remedy this issue, the parties entered into a series of agreements intended to enable Ms. Johnson to move into the home and potentially buy it later.[9]

## B.    The 2014 Agreement

The parties' first agreement was a document entitled "Rental Lease Agreement," signed by Ms. Johnson and the Barneses on July 1, 2014 ("2014 Agreement").[10] Under the 2014 Agreement, the Barneses[11] agreed to rent the Property to Ms. Johnson from July 1, 2014 to July 1, 2015, with a monthly

---

[5] *See* RX E; *see also* Tr. 122.

[6] With only one of the three parties at the center of this dispute testifying at trial, hearsay was a persistent issue. The court carefully considered the admissibility of testimony under the Delaware Rules of Evidence.

[7] Tr. 11; *see also* PX 7.

[8] Tr. 35.

[9] *See* PX 1; PX 7; PX 8.

[10] PX 7.

[11] *Id.* Mr. Barnes and Ms. Barnes both signed the 2014 Agreement, but the 2014 Agreement identifies only Mr. Barnes as "Landlord." The reason why is unknown.

– 3 –

rental payment of $1,200 due on the first business day of each month.[12]  On the fifth page of the 2014 Agreement, there is handwritten language referencing Ms. Johnson's purchase of the Property:

July 1, 2014

25.A)

> In the month of September or beginning of October earnest money will be surrender[ed] to landlord in the amount of $2,500.00 for purchase of said property. Agree[d] price of $287,000 — upon settlement of insurance claim.[13]

At the beginning and end of the written language are two sets of initials: "LJ" and "MB."[14]  Ms. Johnson testified that those were her and Mr. Barnes' initials.[15]  Although Ms. Barnes' initials do not appear on the page, Ms. Johnson testified that Ms. Barnes was "told everything that [Ms. Johnson and Mr. Barnes] were doing" with the Property.[16]  Ms. Johnson also maintained that, for "conversations with the repairs, conversations with the house," Ms. Barnes "was physically present and able to comment."[17]

---

[12] *Id.* ¶¶ 1, 2.  The annual rent amount is difficult to read.  It looks like $11,000 may have been written first and then $14,400 written on top of it.  But the monthly amount of $1,200 (one-twelfth of $14,400) is very clear, and that is the monthly amount Ms. Johnson testified to paying.  Tr. 34.  So the court finds that the total annual rent under the 2014 Agreement was $14,400.

[13] *Id.*

[14] *Id.*

[15] Tr. 94–95.

[16] Tr. 38.

[17] Tr. 39.

On or about November 5, 2014, Ms. Johnson tendered a check to the Barneses for $2,500.00 representing the earnest money payment for her option to buy the Property for $287,000.[18]

By its terms, the 2014 Agreement ended on July 1, 2015, without Ms. Johnson seeking to exercise her option to purchase the Property for the stated $287,000 price before then. The parties did not promptly execute a new lease; instead, Ms. Johnson continued to reside at the Property with permission from the Barneses,[19] making the same $1,200 payment each month.[20]

## C.    The 2016 Agreement

On April 1, 2016, Ms. Johnson and the Barneses entered into another agreement, also entitled "Rental Lease Agreement" ("2016 Agreement").[21] Under the 2016 Agreement, the Barneses agreed to rent the Property to Ms. Johnson from April 1, 2016 to April 1, 2017, with payment of $1,400 due on

---

[18] *See* PX 2 at P006. PX 2 is a series of receipts that Ms. Johnson used to memorialize her payments. The receipts were typically signed by Ms. Johnson and Mr. Barnes, but Ms. Johnston testified that Ms. Barnes would sign them if Mr. Barnes was not available. Tr. 46.

[19] *See* Tr. 41.

[20] *See* PX 2 at P022–P023, P025, P027–P028, P030, P032–P033.

[21] PX 8. As with the 2014 Agreement, the 2016 Agreement is signed by both Mr. Barnes and Ms. Barnes, but only Mr. Barnes is identified as "Landlord." Neither party submitted a complete copy of the 2016 Agreement as a trial exhibit, but they agreed that the missing pages are identical to pages 2 through 4 of the 2014 Agreement, and that the court can treat the combination of PX 8 and pages 2 through 4 of the 2014 Agreement (PX 7) as constituting the terms of the 2016 Agreement. Tr. 43–44.

the first business day of each month during the rental period.[22]  And, as with the 2014 Agreement, there is handwritten language on the fifth page of the 2016 Agreement referring to Ms. Johnson's purchase of the Property:

April 1, 2016

25.A)

In the month of April, 2016 earnest money will be surrender[ed] to landlord Maurice Barnes in the amount of $2,500 for purchase of said property 282 Beechwood Ave. Agree[d] price of $287,000 upon settlement.[23]

At the end of this passage are a set of initials: "LJ" and "MB."[24]  Ms. Johnson testified that those are her and Mr. Barnes' initials.[25]  When she signed the 2016 Agreement, Ms. Johnson's "intent was still . . . to purchase the property."[26]  Ms. Johnson tendered the $2,500 earnest money payment to the Barneses on or about April 1, 2016.[27]

As with the 2014 Agreement, the end of the 2016 Agreement arrived without the parties signing a new lease or Ms. Barnes exercising her option to

---

[22] PX 8 ¶¶ 1, 2.

[23] PX 8.

[24] *Id.*

[25] Tr. 41.

[26] Tr. 44.

[27] PX 2 at P035.

purchase the Property.[28]   Instead, Ms. Johnson continued to reside at the Property,[29] paying the same $1,400 monthly rent.[30]

## D.    The 2018 Schedule

Thirteen months later, Ms. Johnson and the Barneses gave it another go. It is difficult to describe what the parties tried to do this time because they did not document it well and Ms. Johnson's testimony at trial on this point was hazy. But this much seems clear:  Mr. Barnes offered Ms. Johnson a form of seller financing that would give Ms. Johnson more time to come up with the money to pay for the Property. In concept, Ms. Johnson would make monthly payments of principal and interest for five years, with a large balloon payment due at the end of those five years, and the Barneses would sign over the deed upon receipt of that balloon payment.

The evidence here is unfortunately thin. There is no complete, written document describing what the parties wanted to do, as there was with the 2014 Agreement and the 2016 Agreement. The only document that helps clarify what the parties tried to do is a three-page amortization schedule prepared with the assistance of MyCalculators.com ("2018 Schedule").[31] The 2018 Schedule

---

[28] *See* Tr. 84–85.

[29] *Id.*

[30] *See* PX 2 at P050, P052–P054, P057–P063. Some of the receipts are for $1,476 and appear to reflect $1,400 for the rent due and $76 for utilities.

[31] *See* PX 1; *see also* Tr. 45 ("This is what Maurice gave me for how we were going to pay – how I was going to pay for the house.").

reflects a $239,700 loan with a 4% interest rate, reflecting 60 monthly payments of $1,144.36 from May 2018 through April 2023, and a final balloon payment of $217,525.63 due May 2023.[32] But just as important as what is on the 2018 Schedule is what is not: the 2018 Schedule does not state its purpose; it does not identify the Property; it does not identify the $239,700 loan as the agreed-upon purchase price of the Property; and it does not name the parties to whom it applies. Nor does it contain signatures, although there are two sets of initials, "LJ" and "MB" found near the first monthly payment on the first page.[33]

At trial, Ms. Johnson filled in some of the gaps. She testified that Mr. Barnes prepared the 2018 Schedule as a way for her to purchase the Property,[34] that she understood he had done something similar for a property in New York,[35] and that the $239,700 loan amount was the agreed-upon purchase price.[36] Ms. Johnson understood her obligations under this arrangement were to "maintain the house" and "pay [Mr. Barnes] on time."[37]

---

[32] PX 1.

[33] *Id.* Ms. Johnson testified that those initials were added by her and Mr. Barnes. Ms. Barnes' initials do not appear anywhere on the document.

[34] Tr. 45–46.

[35] Tr. 46.

[36] *Id.*

[37] Tr. 47.

From May 2018 onward, Ms. Johnson continued to make payments to the Barneses. Though the 2018 Schedule contemplates monthly payments of $1,144.36, Ms. Johnson appears to have instead made payments of $1,400,[38] the same amount she had been paying under the 2016 Lease.[39] Ms. Johnson testified that she paid the higher amount because she believed that paying an extra $255.64 per month would help "get the house taken care of,"[40] and she says that it was to build up equity in the Property before taking full ownership.[41]

## D.    The Passing of Mr. Barnes

Mr. Barnes passed away in June 2021.[42] After his death, Ms. Barnes "started signing" the receipts for payments made by Ms. Johnson.[43] Ms.

---

[38] *See generally* PX 2 at P064–P118.

[39] *See* PX 8.

[40] Tr. 46; *see also id.* 92–93 (Ms. Johnson affirming her belief that the difference between the agreed-on and actually paid price "would reduce how much [she] would owe"). There are discrepancies, however, such as Ms. Johnson paying only $1,144.63 in May 2018 (PX 2 at P064), followed by what appears to a double payment of $2,800 in June 2018 (PX 2 at P065), followed by a $1,476.20 payment in July 2018 (PX 2 at P066).

[41] Pet. ¶ 46; Tr. 156–157.

[42] Tr. 56.

[43] *Id.* Ms. Johnson's testimony on this point is only in general terms. She did not offer any testimony at trial that Ms. Barnes signed or initialed specific receipts in PX 2. The relevant receipts kept by Ms. Johnson appear to be in the general range of P095–P118 in PX 2. But only some of those receipts appear to contain a signature that may belong to Ms. Barnes. *See* PX 2 at P095, P098, P100–P110, and P116–P117. Other receipts lack any signatures but do have somebody's initials. *See* PX 2 at P096–P097, P099, P111–P115, and P118.

Johnson maintains that, besides Mr. Barnes' passing, "everything just continued as it was."[44]  In November 2021, Ms. Johnson first met Gerry Barnes.[45]

At trial, Gerry Barnes explained that he spoke with Ms. Johnson twice about her purchasing the Property, once in September 2022, and once in June 2023.[46]  Gerry Barnes maintained that he wanted to raise the purchase price and, upon being asked by Ms. Johnson, estimated the price as being "between $300[,000] and $350,000."[47]  During the June 2023 meeting, Gerry Barnes told Ms. Johnson "that him and Ms. Barnes had discussed the house and he was putting the house on the market . . . ."[48]  Gerry Barnes told Ms. Johnson that she "would have to leave."[49]  Ms. Johnson told Gerry Barnes that she "still wanted the house and that [Mr. Barnes] and [Ms. Johnson] had agreed on [Ms. Johnson] purchasing the house."[50]  Ms. Johnson testified that Gerry still gave her the opportunity to purchase the home, but on different terms than she believed she had agreed to with Mr. Barnes.[51]

---

[44] Tr. 57.

[45] *See* Tr. 73.

[46] Tr. 104–105.

[47] Tr. 106.

[48] Tr. 58.

[49] *Id.*

[50] *Id.*

[51] *Id.*

Until his June 2023 conversation with Ms. Johnson, Gerry Barnes was "unaware of what [Ms. Johnson] thought was a contract to buy the property."[52] He eventually found copies of the agreements in Mr. Barnes' office but testified that he had "no personal knowledge of whatever agreements were had between" Ms. Johnson and the Barneses.[53] Gerry Barnes also testified that there was never any complaint that Ms. Johnson failed to make payments on time.[54]

Recall the 2018 Schedule. It contemplates Ms. Johnson making a final ballon payment of $217,525.63 in May 2023.[55] She did not.[56] When asked why at trial, Ms. Johnson says that she "forgot all about it"[57] and that she believes that Ms. Barnes had also forgotten about it.[58] But in that same thought she also said, "I just never thought about bringing it up again . . . . I just said to [Ms. Barnes] when you're ready to go to court and get the house settled, let me know."[59] She also believes that she and Mr. Barnes never fully agreed on the

---

[52] Tr. 110.

[53] Tr. 126.

[54] Tr. 135–136.

[55] *See* PX 1; *see also* Tr. 59.

[56] Tr. 59.

[57] Tr. 60.

[58] *Id.*

[59] *Id.*

Property's purchase price, which was, she testified, dependent on whether Mr. Barnes made repairs.[60]

On November 15, 2023, Gerry Barnes filed a petition for summary possession of the Property, against Ms. Johnson, in the Justice of the Peace Court.[61]  The court there dismissed the action for lack of ripeness.[62]  Since this dispute arose, Ms. Johnson has been sending her monthly payments to her counsel, who has been holding them in an escrow account.[63]

At the time of trial, Ms. Johnson had not filed a mortgage application with any lending institution.[64]  She testified that she does "not currently have the ability to purchase the home" on her own.[65]  She presented evidence that her son-in-law would cosign a mortgage application, but testified she had not yet completed an application.[66]

## E.  Repairs to the Property

Another related issue that was the subject of testimony during trial was repairs to the Property that have been made to the Property during the time Ms.

---

[60] Tr. 88–90.

[61] *See* D.I. 1, Ex. I; *see also* Tr. 149.

[62] D.I. 1, Ex. 1.  This exhibit was not introduced at trial, but the court takes judicial notice of the document as a judicial record.  *See* D.R.E. 202(d)(1)(C).

[63] *See* Tr. 66–69.

[64] Tr. 91.

[65] Tr. 92.

[66] Tr. 62–63, 100–102.

Johnson has resided there. Ms. Johnson testified that Mr. Barnes told her that "he would take care of the major things first."[67] Ms. Johnson maintained that "[i]t was [her] understanding that [Mr. Barnes] would make the major repairs before an official signing."[68] Ms. Johnson testified that she assisted Mr. Barnes with making repairs around the Property and presented receipts to document those repairs.[69] But she also testified that she did not provide financial assistance for major repairs to the home.[70]

After Gerry Barnes began managing the Property, he made repairs to the home or had professional work done on the Property.[71] Gerry Barnes asserted at trial that Ms. Johnson "made no repairs on the house other than the minor things that, you know, putting the rocks around the posts."[72] Gerry Barnes also testified that the cost of major repairs after Mr. Barnes' death was borne by Ms. Barnes.[73] Ms. Johnson agrees.[74] Gerry Barnes also reimbursed Ms. Johnson for the garage door she had replaced for the Property.[75]

---

[67] Tr. 22.

[68] *Id.*

[69] *See* PX 4.

[70] *See* Tr. 65–66.

[71] *See* Tr. 110–114.

[72] Tr. 139.

[73] *See* Tr. 110, 113–114.

[74] *See* Tr. 65–66, 74.

[75] *See* RX I.

## II.   PROCEDURAL POSTURE

On November 21, 2023, Ms. Johnson filed a Petition for Specific Performance ("Petition").[76]   The Petition asserts six counts:   (1) specific performance; (2) breach of contract; (3) promissory estoppel; (4) a request for an accounting; (5) unjust enrichment; and (6) damages.  On December 11, Ms. Barnes filed her verified answer to the Petition.[77]   On February 6, 2024, Ms. Barnes moved for summary judgment.[78]  The parties briefed the motion and the court held oral argument on July 11.[79]  The court denied the motion the same day.[80]  Discovery began, and on November 7 this action was reassigned to the current judicial officer.[81]

The court held a pretrial conference on February 10, 2025.[82]  That same day, Ms. Johnson requested "leave to enter additional exhibits" into the record relating to her son-in-law as a potential cosigner on a mortgage application.[83]  The court granted the request.[84]  On February 13, the court held trial, heard testimony from three witnesses (Ms. Johnson, her son-in-law, and Gerry

---

[76] D.I. 1.

[77] D.I. 5.

[78] D.I. 9.

[79] D.I. 18.

[80] D.I. 19.

[81] D.I. 26.

[82] *See* D.I. 36.

[83] D.I. 37.

[84] *See* Tr. 5–7.

Barnes), followed by closing arguments. The court then took the case under submission.[85]

## III.   ANALYSIS

As noted, Ms. Johnson asserts six counts in her petition. Ordinarily, the court would address each of the counts in order, but proceeds differently here because for four of the six counts (specific performance, breach of contract, promissory estoppel, and unjust enrichment) the only relief Ms. Johnson seeks is the compelled sale of the Property.[86] Judicial economy suggests resolving the availability of specific performance first, because if specific performance is not an available remedy consideration of the other elements necessary to succeed on those claims is unnecessary.

### A.    Specific Performance Is Not an Available Remedy

"A party seeking specific performance must establish that (1) a valid contract exists, (2) [they are] ready, willing, and able to perform, and (3) [] the balance of equities tips in favor of the party seeking performance." *Polk v.*

---

[85] D.I. 38.

[86] Pet. ¶¶ 22 ("By both principles of equity and Delaware statute the Petitioner is entitled to specific performance"); 26 ("Petitioner has no adequate remedy at law and petitions the Court for enforcement of her right to redeem [the Property]."); 32 ("Enforcement of the sale is necessary to avoid injustice."); 41 ("Failing to enforce the agreement would mean that [the Barneses] were afforded all of the securities of the agreement and none of the risks."). Specific performance is also the only remedy Ms. Johnson explicitly requests in her prayer for relief. Pet. at 11 ("Petitioner prays for specific performance of the contract and any other relief as may be afforded."). Ms. Johnson seeks damages via a standalone count (Count VI) which the court addresses later in this report.

*Stewart*, 2025 WL 48155, at *6 (Del. Ch. Jan. 8, 2025) (citations omitted). The elements must be established by clear and convincing evidence. *Id.* Clear and convincing evidence "produces an abiding conviction that the truth of the contention is 'highly probable.'" *In re Martin*, 105 A.3d 967, 975 (Del. 2014).

The linchpin of Ms. Johnson's case for specific performance is her argument that she and the Barneses created a binding contract for her to buy the Property, the terms of which are determined (1) by treating the 2014 Agreement, the 2016 Agreement, and the 2018 Schedule as a single agreement[87] and (2) by reading into that agreement the terms required for real estate contracts with seller financing under Title 25, Section 314 of the Delaware Code, even though those terms do not appear in the parties' agreement.[88] Ms. Johnson takes this approach for two reasons.

First, Ms. Johnson takes this approach because she does not have a valid and enforceable contract without it. As explained below, the 2018 Schedule by itself is not a contract because it is missing too many of the essential elements of a binding contract to accomplish that task. So Ms. Johnson looks to supply

---

[87] Pet. ¶ 19; Tr. 146, 148, 155, 160.

[88] *See* Pet. ¶¶ 25 (alleging Ms. Barnes breached the parties' contract "by refusing to allow Petitioner to redeem the property in accordance with her rights under 25 <u>Del. C.</u> § 314"), 47 (alleging Ms. Johnson is entitled to damages for Ms. Barnes' failure to comply with Section 314); Tr. 145 (arguing that Section 314's protections are "baked" in so as "not to create a loophole so that parties can avoid their contractual obligations"); *see also* Pet'r's Resp. to Opening Br., D.I. 13, at 16 ("Any technical deficiencies of the contract do not rob the buyer of the benefits of the protections guaranteed to them under Section 314.").

material terms missing from the 2018 Schedule but present in the 2014 Agreement and 2016 Agreement—such as the name and signature of Ms. Barnes as the party to be bound—by treating the 2014 Agreement, the 2016 Agreement, and the 2018 Schedule as one integrated agreement.

Second, Ms. Johnson takes this approach because she cannot obtain specific performance without it. Ms. Johnson candidly admits she could not afford to buy the Property when the balloon payment came due in May 2023, nor has she been able to afford to buy the Property at any time since then. Inability to close will ordinarily doom a buyer's claim for specific performance of a real estate contract,[89] but Ms. Johnson argues she still has time to obtain financing and establish her ability to close. She insists that Title 25, Section 314 of the Delaware Code required Ms. Barnes to give Ms. Johnson written notice of the missed May 2023 balloon payment and an opportunity to cure that failure within 120 days, and Ms. Barnes did not give her such notice.

As explained below, Ms. Johnson's argument fails. First, the parties' housing relationship has been continuous, but how they documented it was not:

---

[89] *See, e.g.*, *Appleby Apartments, LP v. Appleby Apartments Assocs., LP*, 2023 WL 2728773, at *3 (Del. Ch. Mar. 31, 2023) (denying specific performance where the plaintiff was unable to close and where the defendant did not contribute to the plaintiff's inability to close); *cf. Walton v. Beale*, 2006 WL 265489, at *3 (Jan. 30, 2006) (citing *Word v. Johnson*, 2005 WL 2899684, at *3 (Del. Ch. Oct. 28, 2005)) ("Specific performance will not be granted to a party who is in default of a material obligation under the contract, unless that party is excused from performance of that obligation.").

the 2014 Agreement, the 2016 Agreement, and the 2018 Schedule are three documents representing three attempts to enable Ms. Johnson to purchase the Property. The 2014 Agreement and the 2016 Agreement were self-contained leases with options to purchase, each intended to last for one year, and they are not part of the 2018 Schedule, which does not mention or reference them in any way. Second, the protections of Title 25, Section 314 are not available to Ms. Johnson because those protections are not in the 2018 Schedule and Section 314 does not impose those terms on real estate contracts with seller financing when the parties fail to include them.

### 1. The 2018 Schedule Is Not a Valid Contract for the Sale of the Property

The first element of specific performance is the existence of a valid contract. "[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (citing *Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006)). The contract "must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms." *Id.* (quoting *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006)).

"Delaware adheres to an objective theory of contracts," which means that "the contract's construction should be that which would be understood by an objective, reasonable third party." *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (quoting *Exelon Generation Acq., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)). "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement." *Alchemy LTD LLC v. Fanchise League Co., LLC*, 2023 WL 4670954, at *5 (Del. Ch. July 20, 2023) (cleaned up).

> The court starts with the text of the contract. When a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. The contract is to be read as a whole, giving effect to each term and provision, so as not to render any part of the contract mere surplusage.

*Centene Corp. v. Accellion, Inc.*, 2022 WL 898206, at *5 (Del. Ch. Mar. 28, 2022) (quotations and citations omitted). "[A]s a 'whole' includes separately executed agreements incorporated by reference, which happens 'where a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it. When that occurs, the two will be interpreted together as the agreement of the parties.'" *Vortex Infrastructure Holdco LLC v. Kane*, 2024 WL 3887117, at *4 (Del. Ch. Aug. 21, 2024) (quoting *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 818–819 (Del. 2018)).

### a. The 2014 Agreement, the 2016 Agreement, and the 2018 Schedule Are Three Separate Agreements, Not a Single Agreement

Ms. Johnson argues that the 2014 Agreement and the 2016 Agreement must be read together with the 2018 Schedule to find the formation of a valid single contract for the purchase of the Property.[90] In closing arguments, she characterized the parties' arrangement as "clear and unambiguous":

> [T]he courts allow, the statute allows, and our case law allows that whereas the [parties] have gone through and have manifested through consideration — again $5,000 in earnest money, as acknowledged by both parties, that enter into it — and with a payment history and no defaults or notices of any default, and where the terms were expressed in multiple places of an intent to sell, and the final price for which it would be sold, and a table for calculating how much it is that it would be sold for, this is as clear and unambiguous of a contract as may be had in a more traditional sales agreement.[91]

The court finds that Ms. Johnson's characterization of the agreements is incompatible with the agreements' plain language. Both the 2014 Agreement and the 2016 Agreement are titled "Rental Lease Agreement."[92] Their terms are sufficiently definite: they identify the Property, the parties, the total price to be paid, the schedule on which payments must be made, and their duration.[93]

---

[90] Pet. ¶ 19; Tr. 146, 148, 155, 160.

[91] Tr. 161.

[92] *See* PX 7; PX 8.

[93] *See generally* PX 7; PX 8.

All parties signed the printed portion of both agreements.[94] The plain language of the 2014 Agreement and the 2016 Agreement establishes that they are self-contained leases with options to purchase[95] and that the parties intended them to last for one year.[96] The 2018 Schedule, for its part, does not reference nor does it incorporate these agreements and it has terms that conflict with the 2014 Agreement and the 2016 Agreement, the most obvious of which is the sale price.[97] Expressing similar intents through multiple documents is not equivalent to one of those documents making reference to or incorporating the terms of the other documents. The record lacks sufficient evidence to find that the parties intended to incorporate the terms of the 2014 Agreement and the 2016 Agreement into the 2018 Schedule, or to treat all three as one agreement.

### b. The 2018 Schedule Lacks Essential and Material Terms Required to be a Valid and Enforceable Contract for the Sale of Real Estate

Having concluded that the 2014 Agreement, the 2016 Agreement, and the 2018 Schedule are not a single agreement, and that the 2018 Schedule does

---

[94] *See* PX 7 at 7; PX 8 at 4.

[95] Ms. Barnes did not initial the handwritten language in each agreement creating the option for Ms. Johnson to buy the Property. Tr. 37, 41. That is irrelevant here because the validity and enforceability of the options in the 2014 Agreement and the 2016 Agreement is not at issue.

[96] PX 7 at 1; PX 8 at 1. Each agreement also states that it would continue month-to-month after the term ended if neither party invoked a right to terminate at the end of the term. *See* PX 7 at 4; *see also* n.21, *supra* (confirming that PX 8's missing page 4 is identical to PX 7's page 4).

[97] *Compare* PX 1*, with* PX 7*, and* PX 8.

not otherwise incorporate the terms of the 2014 Agreement and 2016 Agreement, the court evaluates the 2018 Schedule independently to determine whether it is a valid and enforceable contract between Ms. Johnson and Ms. Barnes. The court finds that it is not.

"This Court has found that the 'price, date of settlement, and the property to be sold' are essential terms of an enforceable contract for the sale of real property." *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *6 (Del. Ch. Feb. 18, 2015) (quoting *River Enters., LLC v. Tamari Props., LLC*, 2005 WL 356823, at *2 (Del. Ch. Feb. 15, 2005)). Enforceable contracts for the sale of real property also require the signature of the party to be charged. *Frye v. Raphaelson*, 2021 WL 4073425, at *2 (Del. Ch. May 3, 2021) (citing 6 *Del. C.* § 2714). As a court of equity, the court "has no role in supplying a contract's essential terms where a party seeks specific performance . . . ." *Pulieri*, 2015 WL 691449, at *6. Thus, "all essential terms of the agreement must be sufficiently definite to establish an enforceable contract." *Id.* (citations omitted).

The 2018 Schedule contains handwritten references to Ms. Johnson and Mr. Barnes: "Barney" was written onto the 2018 Schedule and the initials "LJ" and "MB" are also present.[98] The date of final payment, May 13, 2023, is the

---

[98] PX 1.

date of settlement.[99] These essential terms are present in the schedule. But the schedule lacks material terms. First, Ms. Barnes' signature is missing from the schedule. The statute of frauds requires a valid contract for the sale of property to bear the signature of the party to be charged. *See* 6 *Del. C.* § 2714. Here, Ms. Johnson seeks to charge Ms. Barnes with enforcement of the 2018 Schedule. Without Ms. Barnes' signature, this cannot be done. Second, the 2018 Schedule lacks descriptive information: the Property is not described in the 2018 Schedule, its address is not given, and the names of the parties to the 2018 Schedule are missing, with only handwritten initials and a reference to "Barney."[100] Third, it appears that the parties may not have even reached final agreement on price, given Ms. Johnson's trial testimony that the final price was dependent on whether Mr. Barnes made repairs to the house.[101] Without these material terms, the 2018 Schedule is not a valid written contract for the sale of real property.

The court has considered whether the 2018 Schedule and Ms. Johnson's unrebutted testimony at trial regarding the 2018 Schedule and the circumstances of its creation are sufficient to allow the court to conclude that Ms. Johnson and Ms. Barnes had a partly oral, partly written agreement to sell

---

[99] Tr. 46 ("[T]he P.D. is what [Mr. Barnes] wrote for last payment to be.").

[100] *See* PX 1.

[101] *See* Tr. 88–90.

– 23 –

the Property, and, if so, whether Ms. Johnson's payments to the Barneses from May 2018 onward are sufficient to invoke one "well-rooted exception" to the statute of frauds, "the equitably-derived principle that a partly performed oral contract may be enforced by an order of specific performance upon proof by clear and convincing evidence of actual part performance." *Walton v. Beale*, 2006 WL 265489, at *4 (Del. Ch. Jan. 30, 2006) (quoting *Shepherd v. Mazzetti*, 545 A.2d 621, 623 (Del. 1988)). The court concludes that the evidence does not support invocation of the part performance exception to the statute of frauds, because the court cannot find that the acts relied on to prove part performance "would not have occurred absent a contract or agreement relating to the land,"[102] nor can the court find that these acts are ones which "clearly indicate[] mutual assent of the parties to the contract."[103] Ms. Johnson's monthly payments of $1,400 from May 2018 onward—after the creation of the 2018 Schedule—are indistinguishable from the $1,400 payments she made between July 2016 and April 2018 when the parties were operating under the 2016 Agreement. Likewise, Ms. Johnson's assistance with the performance of repairs at the Property by Mr. Barnes is something she had done throughout her residency at the Property.

---

[102] *Sargent v. Schneller*, 2005 WL 1863382, at *5 (Del. Ch. Aug. 2, 2005) (citing *Shepherd v. Niles*, 125 A. 669, 670 (Del. Ch. 1924)).

[103] *Id.*

### 2. Even if the 2018 Schedule Were a Valid Contract, Ms. Johnson Is Not Ready or Able to Perform Her Obligation to Purchase the Property

The second element of specific performance requires the party seeking specific performance of a contract to be ready, willing, and able to perform their own obligations under that contract. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1161 (Del. 2010) (citing *Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002)). When time is not of the essence, a buyer has a reasonable time to obtain financing and conclude a transaction. *Id.* (citing WILLISTON ON CONTRACTS § 67:15 (2009)). For real estate contracts, the court has found petitioners ready, willing, and able to perform their purchase obligation through evidence of their concrete and independent financial capacity to complete the purchase or through evidence that the petitioner has an approved mortgage or loan. *See, e.g.*, *Morton v. Rogers*, 2018 WL 1023163, at *7 (Del. Ch. Feb. 22, 2018) (finding plaintiff ready, willing, and able when plaintiff "maintained sufficient assets to pay the entire balance of the purchase price, and . . . offered to tender the balance of the purchase price . . . ."); *Walton*, 2006 WL 265489, at *6 (finding plaintiff ready, willing, and able where plaintiff acquired a bank loan and testified that "he had all the money he needed to purchase the property").[104] *But see, e.g.*, *Appleby Apartments LP v.*

---

[104] As the Delaware Supreme Court explained in *Osborn*: "A prospective purchaser is not able to perform . . . for purposes of obtaining specific performance, when funds from third parties are needed to make the purchase, and those parties are not bound to

– 25 –

*Appleby Apartments Assocs., L.P.*, 2023 WL 5620830, at *4 (Del. Ch. Aug. 30, 2023) (denying specific performance where plaintiff "failed to secure a new loan in time for closing, sought (but did not get agreement on) an extension, and failed to close").

Here, even were the court to conclude that there was a valid contract between Ms. Johnson and Ms. Barnes based on the 2018 Schedule, specific performance is unavailable because Ms. Johnson cannot show by clear and convincing evidence that she is ready and able to purchase the Property. Ms. Johnson could not afford to buy the Property when the balloon payment came due in May 2023,[105] nor has she been able to afford to buy the Property on her own since then.[106] She presented evidence at trial that her son-in-law is willing to be a potential cosigner on a mortgage for the Property,[107] but there is no evidence of concrete steps having been taken to complete a mortgage application, let alone get a commitment letter or other confirmation from a lender that funds would be available to close.[108] Even granting Ms. Johnson a reasonable amount of time to obtain financing to buy the Property after the May

furnish the money. A purchaser will be deemed ready and able to perform, by contrast, and the contract will be specifically enforced, where the agreement is subject to financing, and the purchaser is able to obtain it." 991 A.2d at 1161 n.26 (quoting WILLISTON ON CONTRACTS § 67:15 (2009)).

[105] *See* Tr. 96–97.

[106] Tr. 92.

[107] Tr. 62–63.

[108] Tr. 91–92.

2023 due date and default, it has been nearly two years. Specific performance fails on this element as well.

3. **Section 314 of Title 25 of the Delaware Code Does Not Give Ms. Johnson Additional Time to Establish Her Readiness or Ability to Perform Her Obligation to Purchase the Property**

Recognizing the problem that her past and present inability to close on a sale of the Property poses for her request for specific performance, Ms. Johnson argues that assessing her ability to close by looking at the past or even the present is wrong, because she still has time to obtain financing and establish her ability to close under Title 25, Section 314 of the Delaware Code. Specifically, Ms. Johnson argues that (1) Section 314 applies to the 2018 Schedule and required Ms. Barnes to give her a written notice of default for missing the May 2023 balloon payment and demand for full payment, (2) Section 314 gives her 120 days to cure the default after receiving that notice, and (3) Ms. Barnes never sent her a written notice of default so the 120-day clock to make full payment for the Property never started to run.[109] The argument fails because the premise is wrong: Section 314's protections do not apply to the 2018 Schedule. They do not apply because the parties did not include them in the 2018 Schedule and Section 314 does not impose them on seller-financed real estate contracts when the parties fail to do it.

---

[109] Tr. 149.

First, an explanation of Section 314.

Broadly stated, the purpose of Section 314 is to set down guidelines for terms that should be in seller-financed real estate contracts. Such contracts must "clearly state the principal amount of seller financing, exclusive of interest, which comprises the purchase price thereunder . . . ." 25 *Del. C.* § 314(b). They must also have "a complete amortization schedule for all payments to be made under such financing agreement," *Id.* § 314(a), and that schedule must have three things: (1) "a per payment breakdown of principal and interest and a per payment computation of the unpaid principal balance remaining"; (2) "a statement that the seller or sellers and purchaser or purchasers have read and understand the amortization schedule"; and (3) it must "[b]e signed by the seller or sellers and purchaser or purchasers." *Id.* § 314(a)(1)–(3).

The General Assembly, perhaps mindful of the risk for consumers when the deed in a seller-financed residential real estate transaction does not change hands for years, amended Section 314 to set a baseline for the timing of such transactions. Under Section 314(c), as now enacted, transactions involving seller-financed real estate contracts for "consumer purpose property"[110] must go

---

[110] The statute defines "consumer purpose property" as "1-to-4-family residential real property used primarily for personal, family or household purposes, and shall not include any other property, including multi-unit residential property such as an apartment building, office property, commercial property or industrial property." 25 *Del. C.* § 314(c). Prior to 2011, Section 314(c) applied to all transactions involving

– 28 –

to "final settlement"[111] within six months, although the parties can by written agreement extend the deadline by another six months. *Id.* § 314(c). But the General Assembly also gave parties a way to opt out of Section 314(c)'s timing requirement. Under Section 314(d), parties can delay final settlement until the last installment of the purchase price is paid, but only if their written agreement includes provisions stating:

> (1) The periodic rental value of the real estate, which is not to exceed 75% of the original periodic installment amount under the conditional sales agreement;
>
> (2) In the event of buyer or buyers default for failure to pay, the buyer or buyers have a right to redeem the property by making full payment of the remaining contract amount within 120 days of the seller or sellers providing written notice of the default;
>
> (3) If, after default, the buyer or buyers fail to redeem the property by full payment within 120 days, the contract converts by law to a landlord/tenant agreement, wherein rent shall be the rental value established in paragraph (d)(1) of this section above and which shall apply retroactive to the date of default;
>
> (4) In the event of the agreement being converted to a landlord/tenant agreement after default, any amount paid by the buyer or buyers as a down

---

"improved or unimproved residential real estate." *See* 76 *Del. Laws* ch. 311, § 1 (2008).

[111] The statute defines "final settlement" as "a transaction wherein the seller conveys or sellers convey a deed to the residential real estate to the buyers in return for payment amounting to the purchase price, which may include a mortgage in the amount of any financing extended by the seller or sellers." 25 *Del. C.* § 314(c).

> payment on the conditional sales agreement shall be deemed a security deposit, with any amount exceeding that allowed by § 5514 of this title first being credited towards arrears in rent and any remainder excess paid to the tenant.

*Id.* § 314(d).

Having addressed the contents and timing for final settlement of seller-financed real estate contracts, the General Assembly also specified the remedy for non-compliance. Section 314(e) addresses non-compliance with the first three subsections of Section 314: "Failure to comply with the requirements of either subsection (a), (b) or (c) of this section shall make the contract voidable at the option of either party to the contract prior to settlement." *Id.* § 314(e). Section 314(f) addresses non-compliance with subsection (d):

> Failure to comply with the requirements of subsection (d) of this section shall make the contract voidable by the buyer or buyers under the conditional sales agreement at any time prior to the payment of the last installment under the agreement, unless in default for failure to pay under the agreement, under which circumstance the agreement shall be voidable by either party until such time as the conditional sales agreement is converted to a landlord/tenant agreement.

*Id.* § 314(f).

As enacted, the meaning of these remedy provisions is plain: "[i]f the required information is not disclosed in the contract of sale, the statute gives the parties an 'out'—they may avoid the contract . . . ." *Ingram v. Thorpe*, 747 A.2d 545, 548 (Del. 2000) (construing the pre-2008 enactment of Section 314).

– 30 –

This is the sole remedy the General Assembly chose to provide for non-compliance with Section 314. The General Assembly could have said that the substantive protections contemplated by Section 314(d) are part of all seller-financed real estate contracts for consumer purpose property even if the parties fail to include them,[112] but it did not and the court will not read into the statute something that is not there.[113]

Returning to the current matter, the General Assembly's decision to provide only the remedy of voidability for non-compliance with Section 314's requirements is dispositive of Ms. Johnson's argument that Section 314 gives her a right to receive a written notice of default for missing the May 2023 balloon payment and 120 days to cure the default after receiving that notice: the statute simply does not say it. So even if the 2018 Schedule were a valid contract, Ms. Johnson is not entitled to specific performance because she cannot demonstrate by clear and convincing evidence that she was ready and able to perform her obligations under the 2018 Schedule when she needed to.

---

[112] *Compare* 25 *Del. C.* § 314(d), *with* 6 *Del. C.* § 2-314 ("Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.").

[113] *See Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) (citation omitted) ("[F]or a court to supply alleged statutory omissions by the legislature transcends the judicial function in a constitutional system that provides for a separation of powers.").

### 4.      A Balancing of the Equities Is Unnecessary

The third element of specific performance requires the court to balance the equities between Ms. Johnson and Ms. Barnes and find that those equities tip in favor of Ms. Johnson. *See Polk v. Stewart*, 2025 WL 48155, at *6 (Del. Ch. Jan. 8, 2025). In doing so, the court must "be convinced that 'specific performance of a validly formed contract would [not] cause even greater harm than it would prevent.'" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1161 (Del. 2010).

The court need not decide this issue because it has already held that the first two elements required for a decree of specific performance are not met, making a balancing of the equities unnecessary. Balancing the equities acts as a check on the exercise of the court's power to order specific performance, "reflect[ing] the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering."[114] Its purpose is not to compel the performance of contractual obligations when a petitioner has failed to establish the first two elements of specific

---

[114] *Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002) (quoting *Bernard Pers. Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990)).

– 32 –

performance—a valid contract and the petitioner's readiness and ability to perform their own obligations under it.[115]

## B.     Ms. Johnson Is Not Entitled to an Accounting Because She Was Not in a Fiduciary Relationship with the Barneses

In Count IV of the Petition, Ms. Johnson seeks an accounting from Ms. Barnes, which she says is merited because there is a fiduciary relationship between the parties due to Ms. Barnes being the "financier of the sale of the Property."[116] Ms. Johnson is not entitled to an accounting because Ms. Johnson and the Barneses were never in a fiduciary relationship. Fiduciary relationships arise in situations "where one person responses special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another." *Hendry v. Hendry*, 2006 WL 1565254, at *10 (Del. Ch. May 26, 2006) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.06[b] at 16-85 (T. Brad Davey et al. eds., 2d ed. 2024)). Ms. Johnson has not established any facts from which the court could infer a fiduciary relationship between her and Ms. Barnes. On the contrary, whether

---

[115] *Cf. Walton v. Beale*, 2006 WL 265489, at *3 (Del. Ch. Jan. 30, 2006) (citing *Word v. Johnson*, 2005 WL 2899684, at *3 (Del. Ch. Oct. 28, 2005) ("Specific performance will not be granted to a party who is in default of a material obligation under the contract, unless that party is excused from performance of that obligation."); *id.* (citing *Meheil v. Solo Cup Co.*, 2005 WL 1252348, at *7 (Del. Ch. May 13, 2005)) ("[S]pecific performance will not be granted if the terms of the contract are unclear or if the court has to supply the meaning to essential elements of the contract.").

[116] Pet. ¶ 36; *see also* Tr. 140.

the parties' relationship is one of lender and borrower, buyer and seller, or tenant and landlord, it is a straightforward, ordinary commercial relationship that, without more, does not give rise to fiduciary duties. *See Addy v. Piedmonte*, 2009 WL 707641, at \*17 (Del. Ch. Mar. 18, 2009) ("The Court of Chancery generally does not apply fiduciary duty doctrine to ordinary commercial transactions . . . ."); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 627 (Del. Ch. 2005), *aff'd in part, rev'd in part*, 901 A.2d 106 (Del. 2006) ("[It] is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships."); *Diehl-Guerrero v. Hardy Boys Constr., LLC*, 2017 WL 886786, at \*2 (Del. Super. 2017) (holding that lenders do not owe fiduciary duties to their borrowers); *McMahon v. New Castle Assocs.*, 532 A.2d 601, 605 (Del. Ch. 1987) (holding same as to landlords and tenants). Accordingly, Ms. Johnson is not entitled to an accounting.[117]

## C.     Ms. Johnson Is Not Entitled to Damages Under Count VI

The final count of the Petition is a claim for damages. It is an unusual claim. A damages award, after all, is a form of relief, not a cause of action,[118]

---

[117] During closing arguments, Ms. Johnson's counsel suggested that the purpose of the accounting was to determine how much money Ms. Johnson would need to pay Ms. Barnes to complete the purchase of the Property if the court awards specific performance. Tr. 156–57, 162–63. With the court declining to order specific performance, this argument, if it was fairly raised, is moot.

[118] *See* 22 AM. JUR. 2D *Damages* § 1 ("'Damages' are monetary compensation for loss or harm suffered by a person, or certain to be suffered in the future, as a result of the

and the Petition does not identify the causes of action on which Ms. Johnson bases her request for damages. Ms. Johnson clarified this in the Pretrial Stipulation and at trial, identifying breach of contract and unjust enrichment as the causes of action entitling her to damages.[119]

Ms. Johnson seeks two kinds of damages. First, she argues that if the court does not award specific performance, she is entitled to a return of what she calls the "equity" in the Property since May 2018: $18,561.97 that she has "accumulated" "per the amortization schedule" and $17,291.96 representing the sum of each month where she paid $1,400 instead of the $1,144.36 listed on the 2018 Schedule.[120] Second, Ms. Johnson argues that she is entitled to damages equal to the difference between what the 2018 Schedule says she was supposed

---

unlawful act or omission of another."); *see also J.J. White, Inc. v. Metro. Merch. Mart*, 107 A.2d 892, 894 (Del. Super. 1954) ("A civil action for damages will lie either for the breach of a contract or for the breach of some duty imposed by law").

[119] Pretrial Stip., D.I. 35, ¶ D(3) ("Damages for Respondent's breach of contract and unjust enrichment at Petitioner's expense"); Tr. 163 ("an award of damages in accordance with [Section] 314 for breach of contract or unjust enrichment under the same principles"). Why Ms. Johnson sought damages this way rather than pursue them as alternative forms of relief within her named causes of action for breach of contract (Count II) and unjust enrichment (Count V) is unclear.

[120] Pet. ¶ 46. Ms. Johnson's calculations are off. She claims her $255.64 monthly overpayments totaled $17,291.96 as of November 2023. *Id.* But May 2018 through November 2023 is 67 months, and the 2018 Schedule contemplates only 60 monthly payments of $1,144.36, through April 2023. PX 1. This is, of course, because the 2018 Schedule contemplates Ms. Johnson making her final balloon payment in May 2023 and acquiring the Property. So Ms. Johnson's claim that she "overpaid" by $255.64 each month from May 2023 onward is based on something that does not exist: a 2018 Schedule with monthly payments of $1,144.36 after April 2023.

to pay per month ($1,144.36) and a figure that represents 75% of that amount ($858.27), which she claims is required by Title 25, Section 314.[121]

Count VI fails as a remedy for breach of contract. First, the court has determined that the 2018 Schedule is not a valid contract between Ms. Johnson and Ms. Barnes, so there can be no liability for an alleged breach. Second, even if the 2018 Schedule were a valid contract between Ms. Johnson and Ms. Barnes, Ms. Johnson failed to establish that Ms. Barnes breached it. It is undisputed that Ms. Johnson failed to tender the balloon payment in May 2023,[122] which excuses Ms. Barnes' nonperformance under the 2018 Schedule,[123] and Ms. Johnson's only argument to get around that basic principle of contract law is that Title 25, Section 314 gives her more time to obtain financing and establish her ability to close.[124] But the court has rejected Ms. Johnson's argument that the terms required for seller-financed real estate contracts under Title 25, Section 314 are incorporated into such agreements

---

[121] Pet. ¶ 47. Under Section 314, these damages are contingent on the 2018 Schedule being converted into a lease as a matter of law following Ms. Johnson's failure to cure after receiving notice of default and would apply only from the date of default. 25 *Del. C.* § 314(d)(3).

[122] Tr. 58–59; Pet. ¶ 15; Pretrial Stip. ¶ B at 4.

[123] *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 6011862, at *27 (Del. Ch. Mar. 1, 2022) (quoting *Brasby v. Morris*, 2007 WL 949485, at *4 (Del. Super. Mar. 29, 2007)) ("[A] party to a contract is excused from performance if the other party is in material breach of his contractual obligations.").

[124] *See* Tr. 149.

even if the parties fail to include them, so there is no breach of contract supporting a claim for damages.

Count VI also fails as a remedy for unjust enrichment. First, it fails because Ms. Johnson seeks unjust enrichment as a remedy for Ms. Barnes' failing to comply with the parties' alleged contract.[125] Unjust enrichment is "a theory of recovery to remedy the absence of a formal contract," *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *12 (Del. Ch. June 29, 2020), and "is not available if there is a contract that governs the relationship between the parties that gives rise to the unjust enrichment claim," *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009). Second, it fails because Ms. Johnson cannot demonstrate an essential element of unjust enrichment: Ms. Barnes receiving and retaining money from Ms. Johnson under circumstances where there is no valid reason for Ms. Barnes to keep it.[126] Ms. Barnes is entitled to a reasonable payment from Ms. Johnson for her occupation and use of the Property, and Ms. Johnson has presented no evidence, independent of the

---

[125] Pet. ¶¶ 40 ("[Ms. Barnes] has been enriched by [Ms.] Johnson's compliance with the contract."), 41 ("Failing to enforce the agreement would mean that [the Barneses] were afforded all of the securities of the agreement and none of the risks.").

[126] Unjust enrichment requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification." *Bandera Master Fund LP v. Boardwalk Pipeline P'rs., LP*, 2024 WL 4115729, at *48 (Del. Ch. Sept. 9, 2024) (citations omitted).

2018 Schedule, that Ms. Barnes retaining the full amount of Ms. Johnson's $1,400 per month payments from May 2023 onward is unreasonable.[127]

## IV.    CONCLUSION

Ms. Johnson is an enormously credible litigant, with nothing to suggest even the slightest artifice or dissembling in her testimony.  I am convinced that Ms. Johnson and the Barneses tried to find a way for her to purchase the Property.  They tried a lease with an option to purchase.  Ms. Johnson was financially unable to complete the purchase.  They tried another lease with an option to purchase.  Again Ms. Johnson was financially unable to complete the purchase.  They then, it seems, tried seller financing, with a large balloon payment due after five years of payments.  Yet again Ms. Johnson was financially unable to complete the purchase.  No matter the point in time, no matter the financial terms, one tragic but undeniable constant has been Ms. Johnson's financial inability to complete the purchase.  She could not then, and she cannot now, on her own, afford the Property.

Perhaps, with more time and her son-in-law's generous assistance, Ms. Johnson could obtain a mortgage that would give her the funds necessary to purchase the house at the disputed price.  But Ms. Johnson's time has run out,

---

[127] These $1,400 monthly payments are the same amount of money Ms. Johnson paid as rent under the 2016 Agreement and during the period between the 2016 Agreement and the 2018 Schedule.  *Compare* PX 2 at P064–P118 (payments starting May 2018), *with* PX 2 at P035–P048 (payments from April 2016 through March 2017), *and* PX 2 at P049–P063 (payments from April 2017 through April 2018).

because her only avenue to securing more time following her May 2023 default—the 120-day cure provision in Title 25, Section 314—is unavailable. Accordingly, the court will not order Ms. Barnes to sell the property to Ms. Johnson under any of the legal theories asserted in the Petition. Nor will the court award damages to Ms. Johnson or direct Ms. Barnes to provide an accounting to her.

I recommend that judgment be denied on all claims in the petition.[128] This is my final report. Under Court of Chancery Rules 144(d) and 6(a)(1)(C), any party taking exceptions must file a notice of exceptions by May 27, 2025.

---

[128] The court acknowledges but declines to address Ms. Barnes' requests in the Pretrial Stipulation for (1) damages under Title 25, Section 1611 for her "carrying costs" for the *lis pendens* Ms. Johnson placed on the Property, (2) disbursement of the escrow fund holding Ms. Johnson's housing payments since this dispute arose, (3) ratification of the Notice of Rent Increase Ms. Barnes sent to Ms. Johnson in November 2023, and (4) an award of "all rent due from [Ms. Johnson] from August 2023 through present." *See* Pretrial Stip. ¶ D Resp't ¶¶ (2)–(4). As to (1), the *lis pendens* statute requires a motion and affidavit, 25 *Del. C.* § 1608, which Ms. Barnes has not filed, and a *lis pendens* cancellation proceeding "is itself a separate proceeding from the underlying lawsuit," *DiSabatino v. Salicete*, 695 A.2d 1118, 1121 (Del. 1997). As to each of (2) through (4), Ms. Barnes did not file counterclaims seeking such relief, instead raising them for the first time in the Pretrial Stipulation. Should the parties be unable to resolve these issues consensually, they can be dealt with in another proceeding in a court of competent jurisdiction.